## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VILLAGE OF HEMPSTEAD, NEW YORK,<br><br>    *Plaintiff*,<br><br>        *v.*<br><br>WIN-HOLT EQUIPMENT CORP.;<br>HOLTLAND LLC;<br>MILES MOSS OF NEW YORK, INC.;<br>MILES MOSS OF ALBANY, INC.;<br>CORE & MAIN LP;<br>MIKBRAD HOLDINGS, LLC;<br>COMMANDER OIL CORPORATION;<br>FORTUNE AVENUE HOLDINGS LLC;<br>CHERY INDUSTRY EQUIPMENT (NEW<br>      YORK) INC.;<br>IRACE REALTY LLC;<br>NASSAU CHROMIUM PLATING CO., INC.;<br>KENDAVE CORPORATION;<br>ROCOCO ASSOCIATES;<br>NEW YORK UNIVERSITY;<br>MEADOWBROOK MANAGEMENT &<br>     REALTY CORP.;  *and*<br>FILDON LLC,<br><br>    *Defendants*. | **C.A. No.  1:25-cv-04571**<br><br><br><br>**CERCLA COMPLAINT**<br>**42 U.S.C. §§ 9607(a) and 9613(f)(1)** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiff, THE VILLAGE OF HEMPSTEAD, NEW YORK (hereinafter "the Village" or "Plaintiff"), and for its Complaint against the Defendants WIN-HOLT EQUIPMENT CORP.; HOLTLAND LLC; MILES MOSS OF NEW YORK, INC.; MILES MOSS OF ALBANY, INC.; CORE & MAIN LP; MIKBRAD HOLDINGS, LLC; COMMANDER OIL CORPORATION; FORTUNE AVENUE HOLDINGS LLC; CHERY INDUSTRY EQUIPMENT (NEW YORK) INC.; IRACE REALTY LLC; NASSAU CHROMIUM PLATING CO., INC.; KENDAVE CORPORATION; ROCOCO ASSOCIATES; NEW YORK UNIVERSITY;

MEADOWBROOK MANAGEMENT & REALTY CORP.; *and* FILDON LLC (hereinafter, collectively, "Defendants"), aver and state as follows:

## **INTRODUCTION**

1.      Plaintiff owns and operates a public drinking water system supplying potable water to approximately 60,000 residential, commercial, and industrial customers in the Village of Hempstead, New York in Nassau County.

2.      The Village's drinking water system includes two water treatment plants and nine (9) groundwater wells, along with associated piping and equipment all located throughout the Village.

3.      The Village's groundwater wells have been, and are being, contaminated by 1,4-Dioxane and synthetic per- and polyfluoroalkyl substances ("PFAS"), including chemicals that break down into 1,4-Dioxane and PFAS, that were purchased, consumed, transported, used, processed, mixed, stored, handled, released and/or disposed of by Defendants and/or otherwise released into the environment from Defendant's properties.

4.      Both 1,4-Dioxane and PFAS are considered "emerging contaminants" because they have not been routinely monitored in the past, they have a real risk to human health, and until very recently were not regulated.

5.      Both 1,4-Dioxane and PFAS have been detected in the Village's drinking water supply.

6.      In this civil action, the Village seeks to recover costs associated with the necessary response to contamination of its water supply wells with both 1,4-Dioxane and PFAS, including but not limited to the costs of removing these contaminants as a result of Defendants' tortious conduct and their release, remedial costs associated with long-term actions to address these

releases, as well as investigation and information gathering costs, and groundwater monitoring costs.

7.    The Village further brings this action to seek, *inter alia*, available remedies under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); to recover compensatory and all other damages and relief, including all necessary funds to compensate the Village for the costs of investigating, monitoring, evaluating, abating, and remediating the presence of 1,4-Dioxane, perfluorooctanic acid (PFOA), and perfluorooctane sulfonic acid (PFOS) in its drinking water, including constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove 1,4-Dioxane, PFOA, and PFOS from public water supplies; as well as periodic sampling of groundwater; and for such other damages and relief the Court may order.

8.    Upon information and belief, defendants' facilities are located within the Plaintiff's public water supply wells zone(s) of capture and utilized materials containing 1,4-Dioxane, PFAS, and other substances that transform into PFAS through biodegradation, in their business operations, and who either tortiously or through ordinary operations used, released, stored, handled, and/or disposed of 1,4-Dioxane, PFAS, and materials containing these contaminants in such a manner that has caused 1,4-Dioxane and PFAS to migrate into and exist in Plaintiff's drinking water, thereby damaging and injuring Plaintiff.

9.    Defendants, as the responsible parties, and not the Village, its taxpayers, or its customers, should bear all past, present, and future costs of addressing the above presence and removal of 1,4-Dioxane and PFAS from its drinking water supply.

10.    Defendants are jointly and severally responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and

continue to cause injuries and damages to Plaintiff, as alleged, either through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## JURISDICTION AND VENUE

11.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief).  Jurisdiction is also proper in this Court under 42 U.S.C. § 9613(b) (the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")).  Pursuant to 28 U.S.C. § 1367(a) the Court has supplemental jurisdiction of all other claims that form part of the same case or controversy under Article III of the United States Constitution. Plaintiff brings this civil suit, in part, pursuant to sections 42 U.S.C. §§ 9607(a) and 9613(g) of CERCLA.

12.     This Court has personal jurisdiction over Defendants by virtue of each Defendant's regular and systematic contacts with New York, including, among other things, conducting business and/or owning property in New York, and because they have the requisite minimum contacts with New York necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice.  *See* N.Y. C.P.L.R. § 302.

13.     Under 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events giving rise to the Plaintiff's claims occurred in this judicial district, and a substantial part of property that is the subject of this action is situated in this judicial district.

**FACTUAL BACKGROUND**

**A.    BACKGROUND on 1,4-Dioxane**

14.    1,4-Dioxane is a highly toxic substance, and it is a synthetic industrial chemical.  It was used primarily as a solvent stabilizer in many industrial processes.  It has been found to migrate considerably farther in groundwater than other solvents, due to the compound's complete miscibility in groundwater and the absence of conditions that promote its biodegradation. When in water, 1,4-Dioxane does not respond to air stripping or granular activated carbon treatment.

15.    1,4-Dioxoane has been used in many products; however, it's largest end use was as a stabilizer for 1,1,1-Trichloroethane ("TCA"), a common industrial solvent and a degreasing agent, most of which was used for metal cleaning.  The majority of TCA was stabilized with 1,4-Dioxane.

16.    According to the History of Use and Potential Sources of 1,4-Dioxane, published by the Interstate Technology Regulatory Council, 1,4-Dioxane is also present as an impurity or by-product in various chemical processes.  It is a common by-product of polyethylene glycol, a surfactant used in a variety of industries, including textiles, paper, lubricants, metal corrosion inhibitors, woodworking fluids, among other uses.[1]  Although most commonly associated with use as a stabilizer in chlorinated solvents, 1,4-Dioxane's uses spanned multiple industries, including but not limited to: medical, pharmaceutical and biotechnical industries; rubber and plastics; inks, paints and coatings; adhesives, automotive and aircraft fluids, pesticides, as well as consumer products and other uses.[2]

---

[1] *See* https://14d-1.itrcweb.org/history-of-use-and-potential-sources/

[2] *See id.*

17.     In 2016, EPA designated 1,4-Dioxane as one of the first 10 chemicals for risk evaluation under the newly amended Toxic Substances Control Act, 15 U.S.C. §§ 2601, *et seq.*, (TSCA).   In November 2024, the United States Environmental Protection Agency (EPA) concluded its risk evaluation for 1,4-Dioxane, an eight-year study, and determined that 1,4-Dioxane "presents an unreasonable risk of injury to human health."[3]  EPA identified health risks such as several types of cancer, including lung and liver cancer.  Short-term exposure may cause eye, nose and throat irritation, and long-term exposure includes kidney and liver damage.  In this final risk evaluation for 1-4-Dioxane, EPA identified health risks including risks of liver toxicity, adverse effects in the olfactory epithelium, and cancer from inhalation or dermal exposures to 1,4-Dioxane, as well as from ingestion of drinking water contaminated with 1,4-Dioxane.

18.     EPA has listed 1,4-Dioxane as a "hazardous substance" under CERCLA because it is classified as a hazardous air pollutant under the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*, and a hazardous waste under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, *et seq.*, (RCRA).  *See* 40 C.F.R. § 302.4, Table 302.4.

19.     1,4-Dioxane is short-lived in the atmosphere, but leaches readily from soil to groundwater, migrates rapidly in groundwater, does not react with oxygen, and soil microorganisms do not degrade it.  It therefore remains ever present until removed.

20.     The EPA regulates 1,4-Dioxane under the Clean Air Act, CERCLA, and RCRA.

21.     After EPA finalized its risk evaluation for 1,4-Dioxane in November 2024, it will now determine appropriate regulations under TSCA and the Safe Drinking Water Act, 42 U.S.C. § 300f, *et seq*.  EPA has not established drinking water standards for 1,4-Dioxane, but in 2013

---

[3] EPA, *Nontechnical Summary of the TSCA Risk Evaluation for 1,4-Dioxane*, (Nov. 2024), *available at*: https://www.epa.gov/system/files/documents/2024-11/5.-1-4-dioxane-.-nontechnical-summary-.-public-release-.-nov-2024.pdf.

EPA had issued guidelines and health standards for it, establishing a screening level of 0.67 parts per billion (ppb) for it in tap water, based on a 1 in $10^{-6}$ lifetime excess cancer risk.[4]  Given the recent risk determination, this level will certainly change.

22.     In New York, on April 26, 2017, in response to growing public concern about drinking water pollution, the former New York Governor Andrew Cuomo signed the Clean Water Infrastructure Act, a $2.5 billion investment in drinking water infrastructure and water quality protection across the state. The legislation requires all New York based water systems to test for 1,4-Dioxane contamination.

23.     In September 2017, Governor Cuomo appointed 12 members to a new Drinking Water Quality Council tasked with ensuring all New Yorkers have access to safe and clean drinking water. The Council's initial responsibility includes recommending an enforceable water quality standard for 1,4-Dioxane as a priority emerging contaminant that at the time was largely unregulated by the federal government. The members of the Council held meetings and received letters and recommendations from interest groups to comply with this mission.

24.     On December 18, 2018, the New York State Department of Environmental Conservation announced that Governor Cuomo's Drinking Water Quality Council recommended the MCL for 1,4-Dioxane to be set at 1.0 part per billion (ppb). The State of New York also approved an effective new treatment technology for 1,4-Dioxane called Advanced Oxidative Process (AOP), which is already being utilized by the Suffolk County Water Authority on Long Island.

---

[4] *See* EPA, Technical Fact Sheet – 1,4-Dioxane (Jan. 2014), *available at*: https://semspub.epa.gov/work/01/575107.pdf.

25.     In 2020, the New York State Department of Health ("NYS DOH") set a drinking water standard of 1.0 ppb for 1,4-Dioxane.

**B.     PFAS and Their Risk to Public Health**

26.     PFAS are man-made manufactured chemical compounds containing fluorine and carbon.  The carbon-fluorine bond is one of the strongest bonds in chemistry and provides PFAS their unique chemical properties.

27.     These synthetic chemicals have been used for decades and found in a wide range of industrial, commercial, and consumer products and activities such as nonstick cookware, industrial waste disposal, pharmaceutical industry, cosmetics and beauty products, mining, plastic fabrication, and landfills and transfer stations, just to name a few.  The wide range of uses is due to their unique properties, such as their mobility, ability to reduce surface tension and use as lubricants, and resistance to heat, water, and oil.  In addition, their resistance to high temperatures and chemical reactions makes them ideal for chemical processing and manufacturing.  PFAS are also used in chemical manufacturing as surfactants and emulsifiers.

28.     Similar to 1,4-Dioxane, according to studies, PFAS have been used in numerous applications and industries, including: adhesives; building and construction industry; cleaning products; coatings, wax, paint, varnish, and inks; electronics industry; plastic and metal etching; metal plating and finishing; packaging, paper, and cardboard; plastics, resins, and rubber; recycling and material recovery; refrigerants; scientific, general use; semiconductor industry; and textiles, among others.[5]

---

[5] *See, e.g.,* Linda G. T. Gaines, PhD, PE, *Historical and current usage of per- and polyfluoroalkyl substances (PFAS): A literature revie*, American Journal of Industrial Medicine, April 20022, *available at*: https://onlinelibrary.wiley.com/doi/full/10.1002/ajim.23362.

29.     Unlike traditional water contaminants, PFAS can cause human health impacts at incredibly small concentrations.  For example, drinking water contaminants like chloride, copper, and nitrate are tested and measured in milligrams per liter; one milligram per liter is equivalent to one part per million.  Other drinking water contaminants like lead and sodium are measured in micrograms per liter; one microgram per liter is approximately one part per billion.  PFAS are an order of magnitude smaller.  PFAS are measured in nanograms per liter; one nanogram per liter is approximately equivalent to one part per *trillion* ("ppt").  To put this in perspective, 1.0 ppt is roughly the equivalent of one drop of water in 20 Olympic-size swimming pools, or 1 second in 32,000 years.

30.     PFAS enter the environment, in part, from industrial and commercial facilities that make or use PFAS or PFAS-containing materials, use or make substances that breakdown into PFAS, make other products, through disposal, spills, releases into the environment, effluent runoff from landfills and transfer stations, and waste disposal.

31.     Due to their strong chemical bond, PFAS are resistant to degradation due to light, water, and biological processes and remain in the environment, particularly in water, for many, many years and are therefore referred to, colloquially, as "forever chemicals."

32.     Because of their unique properties PFAS are mobile and persistent in the environment.   PFAS readily contaminates soils and leach from the soil into surface and groundwater, where they can travel significant distances.  PFAS therefore spread easily once released into the environment.

33.     Once PFAS enter a water supply they spread rapidly because they are water soluble, with contaminated drinking water reaching every home and a service connection's place of business.

34.    EPA has found that PFAS can be released during the manufacturing process through spills, emission vectors, and runoff, and as a component of wastewater and solid waste.[6]

35.    PFAS can leach from solid waste directly into the environment.

36.    Conventional drinking water treatment processes are ineffective at removing PFAS from the water column.

37.    PFAS bioaccumulate, meaning that they tend to accumulate in organisms.  PFAS bioaccumulate in numerous ways.  They are relatively stable once ingested, and bind to proteins and molecules in blood, tissues, and organs rather than fat like many other persistent chemicals. These properties allow them to stay in the human body for long periods of time, and long-term exposure, such as drinking PFAS contaminated water every day, can cause significant accumulation even at low levels of exposure.  For example, in humans PFOA and PFOS remain in the body for years.  Thus, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present and only increase health risks over time.

38.    PFAS also biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

39.    PFAS are toxic and cause significant adverse effects to human health.  Human studies show associations between PFOA and PFOS levels in blood and an increased risk of several health effects, including effects on the liver, the immune system, increased risk of high blood pressure, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.  In

---

[6] *See, e.g.,* EPA, *Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances – Version 2 (2024)*, April 8, 2024, *available at*: https://www.epa.gov/system/files/documents/2024-04/2024-interim-guidance-on-pfas-destruction-and-disposal.pdf.

addition, PFOA is associated with high cholesterol, decreases in antibody responses to vaccines, high blood pressure and preeclampsia during pregnancy, and decreased birthweight.

40.     These injuries can arise months or years after exposure to PFAS.

41.     PFAS' extreme persistence in the environment and its toxicity, mobility, and bioaccumulation potential, pose significant adverse effects to human health and the environment.

42.     PFOS, PFOA, perfluoroheptanoic acid (PFHpA), perfluorohexanoic acid (PFHxA), and (PFHxS) are among the 29 contaminants now being monitored under EPA's Fifth Unregulated Contaminant Monitoring Rule ("UCMR 5"), a rule EPA promulgated under the Safe Drinking Water Act.[7] This rule is part of a federal initiative to collect data on unregulated contaminants in public drinking water systems. The goal is to determine the prevalence, concentration, and human health impact of these contaminants and assess whether future regulation of them is necessary to protect public health.

43.     PFAS in general cause significant health impacts, such as diminished antibody responses to vaccines and reduced immune cell function leading to increased susceptibility to infections.

44.     EPA has concluded that PFOS and PFOA are likely to be carcinogenic to humans, and likely to cause hepatic, immunological, cardiovascular, and developmental effects in humans.

45.     PFHpA is suspected to cause cancer, cause endocrine disruption, accelerated puberty, cause liver and immune system damage, and linked to reduced fertility and low birth rates. Chronic exposure to PFHpA, such as consuming contaminated drinking water over an extended period, poses serious health risks.

---

[7] Final Rule, Revisions to the Unregulated Contaminated Monitoring Rule (UCMR 5) for Public Water Systems and Announcement of Public Meetings, 86 Fed. Reg. 73131 (Dec. 27, 2021).

46.     EPA has identified health risks associated with PFNA, especially through drinking water.  These include developmental effects, immune system impacts, thyroid issues, and neurodevelopmental problems.  PFNA has been used in products including cleaning and polishing products and is a breakdown of other PFAS.

47.     Research indicates exposure to PFHxS has been linked to various potential health effects, including impacts on the thyroid, affecting metabolism, development, and neurological function; liver toxicity and increased incidence of liver tumors; developmental issues, such as delayed puberty and reduced birth weight; and potential kidney damage.  PFHxS is particularly persistent in humans, with a half-life of 5-8 years.  Chronic exposure to PFHxS, such as consuming contaminated drinking water over an extended period, poses serious health risks.  PFHxS is used in water and stain coatings for consumer products like electronics and packaging.  It has been used industrially as a surface protection agent for cleaning and polishing products, and other industrial fluids and water-proofing agents.

48.     On April 10, 2024, EPA announced enforceable levels for PFOA, PFOS, and other PFAS in drinking water.  EPA set maximum containment levels (MCLs) for PFOA and PFOS at 4.0 ppt (also expressed as ng/L) under the Safe Drinking Water Act.[8]  On May 14, 2025, the Trump Administration announced that EPA would retain drinking water standards for PFOA and PFOS and reevaluate standards EPA had set for others.[9]

49.     Effective July 9, 2024, EPA designated both PFOS and PFOA as a "hazardous substance" under the Comprehensive Environmental Response, Compensation, and Liability Act

---

[8] *See* Final Rule, PFAS National Primary Drinking Water Standards, *See* 89 Fed. Reg. 32532 (April 26, 2024).

[9] *See* EPA Press Release, *EPA Announces it Will Keep Maximum Containment Levels for PFOA, PFOS* (May 14, 2025), *available at*: https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos.

("CERCLA"), 42 U.S.C. §§ 9601 *et seq.,* because EPA determined that PFOS and PFOA "may present a substantial danger to the public health or welfare or the environment when released."[10] Under CERCLA, the quantity or concentration of a hazardous substance is not a factor.

**C.    PFAS and 1,4-Dioxane in the Village of Hempstead Public Water Supply and Defendants' Connection to It**

50.    A safe and plentiful drinking water supply is essential to the health and welfare of the Village's residents and to the local economy.

51.    The Village is responsible for providing safe and reliable drinking water to approximately 60,000 full time residents.[11]

52.    The Village draws water from the Magothy aquifer through nine drilled wells, connected to two separate water filtration plants.  Water from this aquifer comes from rainfall that percolates into the ground.  Soil layers are mostly sand and clay that become saturated with rainwater and are called aquifers.

53.    The Magothy aquifer features high hydraulic conductivity, enabling contaminants to spread rapidly.  The geology in the area allows for relatively easy vertical migration to the aquifer because of discontinuous, shallow clay layers.  Because of the high amount of impervious cover in the Village, contaminated runoff is directed into groundwater.

54.    In 1978, EPA designated the Long Island aquifer system as one of the first "sole source" aquifers in the country under the Safe Drinking Water Act, 42 U.S.C. §300h-3(e).  A "sole source" aquifer is "an aquifer which is the sole or principal drinking water source for the area and which, if contaminated, would create a significant hazard to public health."  EPA observed that

---

[10] Final Rule, Designation of Perfluorooctanic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed Reg. 39124 (May 8, 2024).

[11] As of 2020 Census according to Village of Hempstead 2024 Annual Water Qualify Report, *available at*: https://www.villageofhempstead.org/DocumentCenter/View/15707/-WATER-QAULITY-REPORT-2024

"[s]ince contamination of the ground-water aquifer can be difficult or impossible to reverse, contamination of the aquifer system underlying Nassau and Suffolk Counties, New York, would pose a significant hazard to those people dependent on the aquifer system for drinking purposes."

55.    This aquifer is particularly susceptible to contamination due to the region's sandy, highly permeable soils and shallow water tables.  This facilitates the infiltration and migration of PFAS contamination.

56.    Water is pumped and treated at two water plants prior to being pumped to the Village's distribution system.

57.    The Village regularly tests its drinking water.  In 2023, the Village conducted over 14,000 tests on its water, for 190 different chemicals, contaminants, or water quality parameters.

58.    The Village has participated in EPA's Unregulated Contaminate Monitoring Rule testing for many years.

59.    Water quality testing mandated by EPA and conducted pursuant to required methodologies shows the Village has elevated levels of PFOS, PFOA, PFHpA, PFHxA, and PFHxS in its drinking water.  The Village collected water samples and tested for contaminants in the accordance with EPA's UCMR.  The following are some of the results, all expressed in parts per trillion ("ppt"):

**Well 4**

| Date | PFBS | PFHpA | PFHxS | PFNA | PFOS | PFOA |
|------|------|-------|-------|------|------|------|
| 03/31/20 | <1.8 | 3.4 | 5.7 | 7.4 | 14.3 | 8.8 |
| 12/22/20 | <1.8 | 5.2 | 5.6 | 10 | 11.6 | 10.6 |
| 03/23/21 | <1.9 | 4.2 | 5.5 | 8.5 | 12.1 | 10.8 |
| 06/15/21 | ND | 3.5 | 5.3 | 7.7 | 13 | 11 |
| 09/21/21 | <1.9 | 5 | 5.5 | 8.8 | 11.5 | 11.2 |
| 06/21/22 | <1.8 | 1.8 | 1.8 | <1.8 | 3.7 | 5.3 |

**Well 5**

| Date | PFOS | PFOA |
|------|------|------|
| 03/24/20 | <1.8 | <1.8 |
| 09/15/20 | 4.4 | 2.9 |
| 12/14/20 | 3 | 2.9 |
| 03/10/21 | 2.4 | <1.8 |
| 06/08/21 | 3.3 | 2.7 |
| 09/07/21 | 3.7 | 2.2 |
| 12/08/21 | 3.6 | 2.4 |
| 01/25/22 | 4.6 | 3 |
| 04/05/22 | 3.8 | 2.9 |
| 11/01/22 | 2.6 | 2.1 |
| 05/05/23 | <1.8 | <1.8 |
| 05/31/23 | <1.8 | <1.8 |
| 08/01/23 | 4.3 | 2.8 |
| 10/03/23 | 4.6 | 3.9 |
| 02/03/24 | 5.22 | 4.61 |
| 06/26/24 | 3.52 | 3.26 |
| 08/01/24 | 4.59 | 4.29 |
| 12/02/24 | 2.39 | 3.23 |
| 03/18/25 | 4.69 | 4.37 |
| 04/08/25 | 4.2 | 4.58 |
| 08/05/25 | 4.37 | 5.12 |

**Well 6R**

| Date | PFNA | PFOS | PFOA |
|------|------|------|------|
| 02/27/20 | <1.8 | 4.3 | 3.4 |
| 12/14/20 | 2 | 5 | 5 |
| 03/10/21 | <1.8 | 4.9 | 3.2 |
| 06/15/21 | ND | 2.9 | 3.9 |
| 09/28/21 | 1.9 | 5.1 | 4.5 |
| 01/25/22 | 2.2 | 6.5 | 4.7 |
| 06/28/22 | <1.9 | 3.2 | 3.4 |
| 10/04/22 | <1.8 | 6.3 | 4.9 |
| 02/28/23 | 3 | 8.1 | 7.6 |
| 07/18/23 | 2.2 | 7.6 | 6.7 |
| 11/21/23 | <1.9 | 10 | 5.1 |
| 01/30/24 | 2.85 | 6.85 | 7.47 |
| 07/30/24 | 2.31 | 6.95 | 7.96 |
| 12/24/24 | <1.74 | 1.93 | 2.93 |
| 03/26/25 | <1.74 | 4.12 | 6.46 |

**Well 8**

| Date | PFHxS | PFNA | PFOS | PFOA |
|------|-------|------|------|------|
| 02/27/20 | <2.0 | <2.0 | 4.4 | 3.8 |
| 12/22/20 | 1.9 | <1.8 | 3.2 | 2.8 |
| 03/17/21 | 3.1 | 3 | 6.8 | 3.7 |
| 06/08/21 | 2.6 | <1.9 | 5 | 4.5 |
| 09/07/21 | 2.5 | <2.0 | 5.1 | 3.7 |
| 03/22/22 | 1.8 | <1.8 | 2.2 | 2.6 |
| 05/24/22 | <1.8 | <1.8 | 2.3 | 2.7 |
| 05/02/23 | 2.6 | 1.9 | 4.1 | 3.8 |
| 05/23/23 | 2.1 | <1.9 | 3.3 | 4.7 |
| 10/03/23 | 2.8 | 2.4 | 5.2 | 5.4 |
| 02/28/24 | 2.87 | 2.42 | 5.2 | 6.25 |
| 04/02/24 | 2.66 | 2.26 | 4.95 | 6.45 |
| 08/27/24 | 2.27 | <1.8 | 3.52 | 4.88 |
| 11/14/24 | 3.64 | 2.54 | 7.45 | 7.1 |
| 02/04/25 | 3.34 | 2.56 | 7.01 | 7.15 |
| 04/15/25 | 2.7 | 2.71 | 5.41 | 7.24 |

60.     Because the Village exceeds EPA's drinking water standards for PFOS and PFAS (the highest detections are more than triple EPA's standards) it must build a special filtration plant to remove these PFAS since traditional water treatment technologies do not.

61.     The Village has begun planning and designing a granular activated carbon ("GAC") water treatment system to remove PFAS contamination from its water supply in order to protect the health of its residents and consumers, and to comply with State and federal drinking water standards.

62.     Water quality monitoring tests from February 22, 2023 to December 19, 2023 revealed the continued presences of 1,4-Dioxane in the Village of Hempstead public water supply wells.  These results ranged from 0.54 ppb to 11.7 ppb, exceeding New York's 1.0 ppb drinking water quality standard for 1,4 Dioxane.

63.     Even though the Village, in January 2021, received a deferral from the New York State Department of Health for any enforcement and fines for violations in exchange for scheduling corrective action to come into compliance with the standard, it must expedite construction of the

treatment system and to remove 1,4-Dioxane from water and be able to deliver water to its consumer free of contaminants.

64.    Moreover, because its wells are contaminated with both PFAS and 1,4-Dioxane, the Village is faced with a daunting and costly task of installing treatment system that removes both from the groundwater. Due to the nature of these hazardous substances, they require different treatment systems. While carbon filters like GAC are effective at PFAS removal, carbon filters are not effective at 1,4-Dioxane removal because this contaminant resists adsorption to carbon filters. Consequently, 1,4-Dioxane removal requires oxidative destruction (an Advanced Oxidation Process ("AOP")) treatment system. PFAS, due in part to their strong carbon-fluorine bonds, resist breakdown in AOP systems, particularly short-chain PFAS like PFHxA and PFHxS. These facts necessitate a comprehensive treatment system designed to remove both 1,4-Dioxane and PFAS.

65.    Thus, the Village will be forced to implement extraordinary and costly measures to combat the contamination and to keep water potable.

66.    The Defendants knew, or should have known, that 1,4-Dioxane and PFAS, and their degradation products and ingredients, create a substantial risk of harm to groundwater and members of the public who consume such groundwater.

67.    Defendants knew or should have known, that the PFASA and 1,4- Dioxane-containing products they were, purchasing, transporting, using, processing, mixing, storing, handling and/or disposing create a substantial risk of harm of contaminating the ground, soil, groundwater, the aquifers, and to members of the public whose water supply originates with the groundwater, therefore, Plaintiff's Water Source.

68.     Defendants negligently distributed, stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise permitted the release of 1,4-Dioxane and PFAS from their properties as to cause severe contamination of ground, soil, groundwater, and/or aquifer, and/or said Defendants own or owned the properties upon which such actions and/or results occurred.

69.     The ordinary use by defendants of products containing PFAS and 1,4-Dioxane (e.g., TCA, degreasers, cutting oils, inks, etc.) and the disposal of PFAS and 1,4-Dioxane-containing waste in the capture zone of the Village's supply wells also inevitably released 1,4-Dioxane into the groundwater.  As to ordinary use, such releases occurred through accidental "leaks" and "spills" inherent in the "handling, storage, transport, and disposal" of waste streams containing solvent and other waste containing 1,4-Dioxane.  The leaks occurred at piping connections or cracks in the machine or tank, while spills occurred during handling of the containers.

70.     As to ordinary disposal, it has been a practice during industrialization on Long Island for users to dispose of waste products, including used solvents, degreasers, oils, acids, etc., by means of depositing wastes into onsite wastewater treatment systems, cesspools, leachate pools, storm drains, recharge basins, dry wells, community sewer systems, and "landfills." The ordinary use, and especially, the ordinary methods of disposal led to 1,4-Dioxane contamination of the Magothy aquifer where Plaintiff draws water from.

71.     Even after installation of a sewer system in Nassau County, the releases would continue to occur as leaks through the sewers because sanitary sewers are generally not leak-proof.

72.     Plaintiff is operating a public water system and has a duty to exercise due care and diligence in the maintenance and supervision of all sources of the public water systems to prevent its pollution and depletion, pursuant to 10 NYCRR § 5-1.71.

73.    Plaintiff is operating a public water system and as a supplier of water has a duty to take the necessary steps to ensure the protection of the public health, including the undertaking of remedial feasibility studies and the installation of a suitable treatment process, pursuant to 10 NYCRR § 5-1.51.

74.    As a direct result of Defendants' careless and negligent acts and omissions 1,4-Dixoane and PFAS percolated the soil and reached the aquifer from which Plaintiff draws potable water to supply its customers.

75.    As a direct result of Defendants' acts and omissions, which are the sole and direct cause of Plaintiff's injuries, Plaintiff's wells have become contaminated from the release and/or releases of Defendants' toxic and hazardous substances thereby rendering the aquifer from which Plaintiff draws it potable water unusable without extensive and expensive treatment.

76.    The Village's damages, caused by the above contamination, include, but are not limited to, investigation costs, testing and monitoring costs, costs of planning, design and installation of water treatment systems, treatment, operating and maintenance costs for many years, infrastructure modifications, engineering fees and other related costs, all to protect its citizens from the harms of PFAS.

**D.    Users of PFAS**

77.    The EPA has established a list from the North American Industry Classification System ("NAICS") Codes and Standard Industrial Classification System ("SIC") Codes, based on EPA records, for entities that have a high risk for the use of PFAS.[12]  EPA uses this data in its PFAS Analytical Tools.[13]

---

[12] *See, e.g.,* EPA, *Metadata for Data Sources within PFAS Analytic Tools (Public)*, July, 2022, *available at*: https://echo.epa.gov/system/files/PFASAnalyticToolsPUBLICMetadata7-13-2022.508_0.pdf.

[13] *See* EPA, PFAS Analytical Tools, *available at*:  https://echo.epa.gov/trends/pfas-tools.

78.     Each Defendants' facility, or facilities, is or are located within the zone of capture of the Village's public supply wells, and each facility has one or more of EPA's identified high risk PFAS NAICS and SIC codes, and PFAS released from them migrated to Plaintiff's Water Source.

79.     Contamination from industrial and commercial operations, like those of the Defendants, can significantly impact groundwater used for Plaintiff's drinking water supplies.

80.     PFAS were and are released from Defendants' facilities via several pathways. These pathways include spills, when contamination is spilled on the ground and leaches into soils and the underground aquifers; wastewater discharge, when PFAS contaminated wastewater is discharged directly into waterways, including groundwater; via sanitary sewers, which then leak into the ground and groundwater; solid waste, and PFAS contaminated solid waste and/or sludge leaching into groundwater and surface water; air emissions, with PFAS released during the manufacturing processes and depositing on soils and water via atmospheric deposition; surface runoff, where PFAS contaminants on the ground get picked up via rainfall or snowmelt and flow to surface waters or migrate to groundwater, via a municipal separate stormwater sewer (MS4) or otherwise.

81.     All of the above pathways have been found to be significant migration patterns for PFAS compounds.

82.     The extreme stability of PFAS compounds means that natural systems that might filter out or mitigate the migration of other contaminants are not as effective for PFAS compounds, the same is true for traditional wastewater treatment plants.

83.     Significantly, the very low threshold for PFAS compounds in drinking water, which is several of orders magnitude smaller than many other contaminants, means that even a *de minimis* amount of PFAS can have a big impact on a drinking water supply.

84.     As a result of Defendants' tortious actions, omissions, and conduct in the use, release, storage, handling, and/or disposal of PFAS and PFAS-containing materials at, near, or within the vicinity of the source water protection area for Plaintiff's Water Source, PFAS have been caused to migrate into and exist in Plaintiffs' Water Source and property, thereby damaging and injuring Plaintiff.

85.     Defendants, as the responsible parties, and not Plaintiff, their taxpayers, or their customers, should bear all past, present, and future costs of addressing the above contamination and removing PFAS from the water supply.

86.     Upon information and belief, the Defendants are responsible, negligently, intentionally and/or in some actionable manner, jointly and severally, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiff, as alleged, either through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## **THE PARTIES**

### **Plaintiff**

87.     Plaintiff, the Village of Hempstead (the "Village"), is a New York political subdivision with its principal place of business at 99 James A. Garner Way, Hempstead, New York 11550.  The Village owns, manages, operates, and controls its water supply system, including

maintenance and improvements of two water treatment plants and its nine public water supply wells.

88.     At all relevant times herein, the Village owned and operated and has been charged with the responsibility of delivering safe, reliable, and high-quality drinking water that meets state and federal standards to residents and businesses of the Village of Hempstead.

89.     At all relevant times herein, the sole source of water utilized by the Village to provide drinking water to the residents and businesses is groundwater drawn from the underground Magothy aquifer via nine (9) groundwater wells ("Plaintiff's Water Source").

90.     The Magothy Aquifer has been designated a sole source aquifer on Long Island, New York – an aquifer where a contamination event could pose a significant hazard to public health due to a lack of alternative drinking water sources.

**Defendants**

91.     Defendants are current and/or former owners and/or operators of properties within the zone of capture of Plaintiff's public supply wells.

92.     PFAS-containing products and1,4-Dioxane and/or products containing 1,4-Dioxane were disposed, spilled, discharged, or otherwise released into the environment, including the groundwater, at various sites within the capture zone, including at the properties operated and/or owned by the Defendants.

93.     At all times relevant to this litigation, Defendants did business in New York as suppliers, consumers, users, handlers and/ or disposers of PFAS-containing products and1,4-Dioxane and/or products containing 1,4-Dioxane at their facilities and/or properties and/or said Defendants own or owned the properties upon which such actions and/or results occurred and from which 1,4-Dioxane and/or PFAS was permitted to migrate and impact Plaintiff's wells.

94.     At all times relevant to this litigation, Defendants disposed, spilled, discharged, or otherwise released PFAS and/or 1,4-Dioxane and/or products containing 1,4-Dioxane at their facilities and/or properties and/or said Defendants own or owned the properties at the time that such actions and/or results occurred, such that each Defendant knew or should have known that 1,4-Dioxane would be released into the soil and groundwater and contaminate areas containing Plaintiff's water supply wells.

95.     As a direct result of Defendants' careless and negligent acts and omissions, PFAS and/or 1,4-Dioxane entered the soil and groundwater at their facilities and/or properties and contaminated the aquifer from which Plaintiff draws potable water to supply its customers.

96.     As a direct result of Defendants' acts and omissions, which are the sole and direct cause of Plaintiff's injuries, Plaintiff's wells have become contaminated with PFAS and/or 1,4-Dioxane, causing damages to Plaintiff's property and requiring Plaintiff to incur costs, as described above.

97.     Defendants' wrongful actions and omissions, which are contributing to the presence of PFAS and 1,4-Dioxane in Plaintiff's wells, are continuing and ongoing.

98.     Any and all references to a Defendant or Defendants in this Complaint include any and all predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

99.     When the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

100.     When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control

or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

101.    Upon information and belief, each of the Defendants is responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and has caused and continues to cause injuries and damages to Plaintiff, either through the defendant's own conduct or through the conduct of its agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## A.    586 COMMERCIAL AVENUE, GARDEN CITY, NEW YORK

102.    The facility located at 586 Commercial Avenue, Garden City, New York was operated by Long Island Pipe Supply Inc., a company that, starting in or around 1975, manufactured and fabricated valves, fittings, and various sprinkler systems for the fire protection industry.

103.    PFAS are used commonly in valves and fittings for their chemical resistance, thermal stability (particularly in fires), and low friction properties.

104.    Solvents like TCA stabilized with 1,4-dioxane are also used in the manufacture of valves, fitting and other metal parts because of their degreasing capabilities.

105.    The facility at 586 Commercial Avenue has a known history of PFAS contamination, and other groundwater contamination due, in part, to its location within an EPA Superfund Site — Old Roosevelt Field Contaminated GW Area (EPA ID: NYSFN0204234) ("Old Roosevelt Field Superfund Site").

106.    This facility is located within the eastern portion of the Old Roosevelt Field Superfund Site, specifically within Operable Unit 2 ("OU2").    EPA conducted a remedial

investigation of OU2 from 2014 to 2016 to determine the extent of groundwater contamination. Following this investigation, EPA identified TCE and PCE as the most persistent contaminants at the highest concentrations.  EPA issued a cleanup plan to address this contamination.

107.    At the request of the New York State Department of Environmental Conservation ("NYSDEC"), EPA tested OU2 for PFAS and 1,4-Dioxane.  In May 2023 EPA collected groundwater samples at the Old Roosevelt Field Superfund Site and reported PFOS concentrations of 11.3 ng/L[14] and PFOA concentrations of 13.0 ng/L, using EPA Method 1633 for analysis.  In this same analysis, several other types of PFAS were identified, including PFBA (3.98 ng/L), PFHpA (4.80 ng/L), PHFxA (5.61 ng/L), PFHxS (3.59 ng/L), and PFNA (2.67 ng/L).

108.    As part of the remedial design for the OU2 remedial action, EPA has proposed installing groundwater extraction wells to address the volatile organic compound (VOC) contamination.  The wells are proposed to be located along Garden Street, near the intersection of Boylston Street, in Garden City, NY.  While this location is located south and hydrologically downgradient of 586 Commercial Avenue, the treatment proposed by the EPA is not designed to address either PFAS or 1,4-Dioxane contamination.

109.    Because PFAS and 1,4-Dioxane are highly soluble and persistent in the environment, they can migrate easily to groundwater and once there travel great distances.  PFAS migrated from this facility in several ways, including leaching from contaminated soils, carried in stormwater to recharge basins, industrial discharges, air deposition from manufacturing activity, and solid waste disposal.

110.    This facility is within the capture zone of the Village's Water Supply.

---

[14] 1.0 ng/L, or 1.0 nanograms per liter, is the equivalent of 1 nanogram of a substance in 1 liter of liquid.  In water, 1 ng/L is the equivalent of 1ppt (part per trillion) because 1 liter of water weighs about 1 kilogram.

111.    Defendant **Miles Moss of New York, Inc.** ("Miles Moss") is a New York corporation with its principal place of business located in New York.

112.    Upon information and belief and at all relevant times herein, Miles Moss was the owner and operator of the facility located at 586 Commercial Avenue, Garden City, New York 11530 until 2019.

113.    The former legal name of Miles Moss was Long Island Pipe Supply Inc. Upon information and belief Miles Moss is a successor in interest to Long Island Pipe Supply.

114.    Miles Moss has a history of environmental non-compliance.  For example, in 1986, NYSDEC recorded a petroleum spill from an abandoned tanker truck at this facility.  The tanker truck had been there for an undetermined number of years and did not have license plates or any serial numbers.

115.    Upon information and belief Miles Moss used both PFAS and TCA at this facility, or materials containing them, as part of manufacturing and/or storage process of valves, fittings, and other materials sold and processed by Miles Moss at 586 Commercial Avenue.

116.    As a direct and proximate result of Miles Moss's actions, conduct, and omissions in the ownership and operation of this facility, PFAS and 1,4-Dioxane released from it migrated to Plaintiff's Water Source.

117.    Defendant **Miles Moss of Albany, Inc.** ("Miles Moss Albany") is a New York corporation with its principal place of business located in New York.

118.    Upon information and belief and at all relevant times herein, Miles Moss Albany also operated at the facility located at 586 Commercial Avenue, Garden City, New York 11530.

119.    Upon information and belief, Miles Moss and Miles Moss Albany have a common parent owner.

26

120.    Miles Moss Albany used PFAS and TCA at this facility, or materials containing them, and valves, fittings, and other materials sold and processed here contained PFAS.

121.    As a direct and proximate result of Miles Moss Albany's actions, conduct, and omissions in the operation of this facility, PFAS and 1,4-Dioxane released from it migrated to Plaintiff's Water Source.

122.    Defendant **Core & Main LP** ("Core & Main") is a Florida limited partnership registered to do business in New York, with more than 370 branches nationwide.

123.    In or around July 2019 Core & Main purchased the assets of the former Long Island Pipe Supply company, and Miles Moss, and now manufactures and/or fabricates valves, fittings, piping networks, and various sprinkler systems for the fire protection industry at 586 Commercial Avenue, Garden City, NY.

124.    Core & Main is the current operator at 586 Commercial Avenue, and has continued the same business operations of Miles Moss, after purchasing the company.

125.    Core & Main used, and continues to use, PFAS and TCA at this facility, or materials containing them, and valves, fittings, and other materials sold and processed here contain PFAS.

126.    Upon information and belief, Core & Main is a successor in interest of Miles Moss and Long Island Pipe Supply Company.

127.    As a direct and proximate result of Core & Main's actions, conduct, and omissions in the operation of this facility, PFAS and 1,4-Dioxane released from it migrated to Plaintiff's Water Source.

128.    Defendant **Mikbrad Holdings, LLC** is ("Mikbrad") a New York limited liability company with its principal place of business in New York.

129.    Mikbrad is the current owner of 586 Commercial Avenue, Garden City, NY.

130.    The hazardous and toxic substances released at the above property contained 1,4-Dioxane.  They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

131.    Mickbrad is liable for the actions, omissions and operations at the 586 Commercial Avenue which have and continue to contaminate Plaintiff's wells with 1,4-Dioxane.

132.    The hazardous and toxic substances released at the above property contained PFAS. They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

133.    Mickbrad is liable for the actions, omissions and operations at the 586 Commercial Avenue Site which have and continue to contaminate Plaintiff's wells with PFAS.

## B.    439 OAK STREET, GARDEN CITY, NEW YORK AND 595 CHESTNUT STREET, GARDEN CITY, NEW YORK

134.    Defendant **Win-Holt Equipment Corp.** ("Win-Holt") is a New York corporation with its principal place of business in New York.

135.    Win-Holt operated a facility at 439 Oak Street (also known as 592 Brook Street), Garden City, NY and 595 Chestnut, Garden City, NY ("Win-Holt Facility") from 1967 until at least 2007.

136.    Win-Holt owned the Win-Holt Facility until approximately 2003.

137.    Win-Holt fabricated carts, shelving, utility tables, sinks, pan racks, stainless-steel equipment, and related metal products as part of their supermarket, foodservice, and distribution product lines.  This includes cutting, grinding, welding, and other metal-working processes.  Win-Holt also conducted painting of metal products at the Win-Holt Facility; the facility included a special paint booth.

138.    Win-Holt had a concrete pad located on the south wall of the Win-Holt Facility's building that was used to hold storage drums (including 55-gallon drums) and metal parts. Two drywells were located beneath this pad for discharging stormwater. Win-Holt removed these drywells in 1997.

139.    The Win-Holt Facility has a long history of environmental contamination, spills, and attempts from local and state regulators to get Win-Holt to come into compliance with environmental laws and cleanup known spills. A December 2002 Investigation Work Plan, prepared by Win-Holt's consultant and submitted to NYSDEC, concluded that contaminated soil and groundwater had been identified at the site, and that "impacted groundwater extends downgradient" of the Win-Holt Facility.

140.    In September 1995, a spill was reported at the Win-Holt Facility (NYSDEC Spill #95-07064) based on a NYSDEC inspection that identified "a visibly-contaminated drywell" on site, and a waste oil aboveground storage tank.[15] On November 26, 1996, NYSDEC requested a remedial action to take place at the Win-Holt Facility to address the waste oil tank, the contaminated drywell, and likely contaminated soils beneath the drywell.

141.    Win-Holt's own analysis of sludge from the drywell showed concentrations of VOCs (including toluene, benzene, and xylene), lead, and chromium all above NYSDEC's recommended soil cleanup objectives. TCA was also detected in the drywell sludge at concentration of 640 ppb.

142.    In 1997, Win-Holt sampled groundwater at its facility at depths up to 30 feet. At 28 feet deep, Win-Holt's consultant found very high levels of ethylbenzene, toluene, and xylenes.

---

[15] FPM Group, *Investigation Report for Win-Holt Equipment Corporation Site*, 592 Brook Street, Garden City, NY for Submittal to NYSDEC (March 2004), Section 2.2.

These totaled 85,072 micrograms per liter (ug/L); at that time, the NYSDEC's ambient water quality standards was 5 ug/L for each of those contaminants.

143.    In 1997, NYSDEC did not require sampling for either PFAS or 1,4-Dioxane.

144.    In 2001, Win-Holt conducted additional groundwater sampling during which TCA was detected at 5,400 ppb at depths between 24 and 34 feet.  At the time, DEC's water quality standard for TCA was 5 ppb.

145.    Win-Holt's consultant noted that "several breakdown products of 1,1,1-TCA" were present, but did not specify which products were detected specifically.

146.    Win-Holt's consultant concluded that "solvent-impacted groundwater was present…in the vicinity of the leaching pool and extended south-southwest."  Win-Holt's consultant identified two contamination plumes originating at the Win-Holt Facility and extending south.

147.    A November 14, 1996 inspection by the Nassau County Department of Health ("Nassau County DOH") revealed that Win-Holt stored waste drums outdoors and noted a visibly contaminated drywell.  This included one 55-gallon drum of trichlorethylene, approximately 300 gallons of paint, and 165 gallons of waste drums, including trichlorethylene and paint.

148.    An October 2, 1997 letter from NYSDEC indicates that a stockpile of soil from the drywell remediation was still on site and uncovered – meaning stormwater was washing these contaminated soils away, allowing them to percolate into groundwater.  NYSDEC requested that the stockpile be re-covered.

149.    A January 5, 1999 letter from the Nassau County DOH listed several violations. These included spills not cleaned up, containers not closed when not in use, not posting the spill procedure, and no records of waste removal on site.

150.    Win-Holt's consultant sampled groundwater at the site in 2003 and detected elevated concentrations of TCA.  Specifically, a ground water sample showed a TCA levels as high as 5,400 pbb.[16]  The consultant identified a plume extending south-southwest of the facility and noted that the Village's Water Supply was less than one (1) mile away.  The consultant noted that "the only compounds detected in both the groundwater plume and in the soil gas were TCA and xylenes." [17]

151.    Win-Holt has admitted to previously using solvents and oil-based paints.

152.    Win-Holt generated and stored hazardous waste at the Win-Holt Facility and was designated as a large quantity generator.[18]  The facility's EPA Identification Number (EPA ID No.) was NYR000013920.   The Win-Holt Facility generated hazardous waste from a mixture of waste paints and solvents stored in 55-gallon drums; spray paint booth air filters; and rags used to apply degreasers to wipe down and clean steel products prior to painting.  These degreasers contained different types of PFAS for their non-stick, thermal stability, and surfactant properties, including PFOS and PFOA, as well as solvents containing 1,4-Dioxane.

153.    On August 13, 2004, Win-Holt entered into an Order on Consent with NYSDEC concerning numerous violations of NYSDEC hazardous waste regulations, for which Win-Holt paid a $12,500.00 penalty ("Win-Holt Consent Order").  As a result of the violations, NYSDEC ordered Win-Holt to submit a closure plan for its hazardous waste facility.  The Win-Holt Consent Order focused on the process Win-Holt used to clean its spray paint guns; specifically, in a June

---

[16] *See* FPM Group, *Investigation Report for Win-Holt Equipment Corporation Site*, 592 Brook Street, Garden City, NY for Submittal to NYSDEC (March 2004).

[17] *See id*.

[18] EPA defines "large quantity generator" as a facility that generates 1,000 kg per month or more of hazardous waste or more than one kg per month of acutely hazardous waste.  *See* https://www.epa.gov/hwgenerators/categories-hazardous-waste-generators.

28, 2004 letter to Win-Holt's counsel NYSDEC stated its "concern is the solvents used to spray paint guns, rather, than the paint itself."[19]  The Win-Holt Consent Order also ordered Win-Holt to submit to NYSDEC "for review a written description of the process and materials used to clean the facility's spray paint guns."[20]

154.    Following the August 12, 2004 Win-Holt Consent Order, NYSDEC re-inspected the Win-Holt Facility and again found that Win-Holt had improperly characterized its waste solvent as non-hazardous waste.  NYSDEC stated: "The Department takes very seriously the company's failure, through lack of knowledge, training, or both, to recognize the hazardous nature of the solvents used to clean its spray guns."[21] NYSDEC also sent Win-Holt a second proposed order on consent that included an increased penalty of $41,750.00.

155.    On May 1, 2008, NYSDEC made a preliminary finding that Win-Holt again violated New York State environmental regulations pertaining to solid and hazardous waste management and served Win-Holt with an administrative Complaint.

156.    Win-Holt used TCA as a cleaning solvent.  During the time Win-Holt operated the property, the majority of TCA have been stabilized with 1,4-Dioxane to prevent its reaction with metals during storage and use.

157.    PFAS, and products containing PFAS, were used commonly as surfactants in metal processing, as cleaning and degreasing agents before further processing, as surface preparation before applying paints and coatings, and to prevent rust during processing.

---

[19] *See* Letter from G. Stephen Hamilton, NYDEC Haz. Waste Counsel, to F. Eisenbud, Esq. (June 28, 2004), re: Win-holt Equipment Group, RCRA Case No: CO 1-20040127-8.

[20] NYSDEC Consent Order, Case No.: CO 1-20040127-8 (Aug. 13, 2004), Matter of Win-Holt Equipment Group.

[21] *See* Letter from G. Stephen Hamilton, NYDEC Haz. Waste Counsel, to F. Eisenbud, Esq. (Nov. 1, 2004), re: Win-holt Equipment Group, RCRA Case No: CO 1-20040127-8.

158.    Upon information and belief, Win-Holt used products containing PFAS and TCA or 1,4-Dioxane as surfactants and for other purposes.

159.    The Win-Holt Facility was located within the capture zone for Plaintiff's Water Source.

160.    As a direct and proximate result of Win-Holt's actions, conduct, and omissions in the operation of this facility, PFAS and 1,4-Dioxane released from it migrated to Plaintiff's Water Source.

161.    Defendant **Holtland LLC** ("Holtland") is a Delaware limited liability company with its principal place of business in New York.

162.    Holtland purchased the Win-Holt Facility in or around 2003 and is the current owner.

163.    Holtland is also the current owner of 595 Chestnut Street, Garden City, New York, which abuts the Win-Holt Facility.

164.    The hazardous and toxic substances released at the above property contained 1,4-Dioxane.  They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

165.    Holtland is liable for the actions, omissions and operations at the 595 Chestnut Street which have and continue to contaminate Plaintiff's wells with 1,4-Dioxane.

166.    The hazardous and toxic substances released at the above property contained PFAS. They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

167.    Holtland is liable for the actions, omissions and operations at the 595 Chestnut Street which have and continue to contaminate Plaintiff's wells with PFAS.

## C. 565 COMMERCIAL AVENUE, GARDEN CITY, NEW YORK

168.   The facility at 565 Commercial Avenue, Garden City, New York is the former location of Pasley Solvents & Chemicals Inc., a chemical company that operated a tank farm storing oils, solvents, and chemicals at the site from approximately 1969 through mid-1982. Activities at the site included delivery and storage of chemicals in tanks on-site, and transfer of the chemicals to 55-gallon drums for delivery to customers.  The site included at least twelve (12) large aboveground storage tanks.  Used chemicals and empty drums were returned to the site by some customers.  Prior to 1969, the site was occupied by Commander Oil Corporation, a fuel oil and gasoline distributor.

169.   In mid-1981 the Nassau County DOH discovered soil contaminated with volatile organic compounds ("VOCs") at this site, which started a remedial investigation.  Pasley Solvents & Chemicals Inc. declared bankruptcy shortly thereafter and is no longer a going concern.  In June 1986 the site was added to EPA's superfund list due to substantial soil and groundwater contamination and is known as the Pasley Solvents and Chemicals Site (EPA ID: NYD991292004).

170.   EPA identified specific chemicals of concern at the site, these are substances found at a superfund site that EPA has determined posed an unacceptable risk to human health or the environment.  The chemicals of concern for the Pasley Solvents and Chemicals Site included TCA in soil and groundwater; 1,1,dichlorethene (1,1-DCE) in groundwater; 1,1-dicholorethane (1,1-DCA) in groundwater; trichloroethene (TCE) in soil; and tetracholorethene (PCE) in soil.  TCA; 1,1-DCE; 1,1-DCA; TCE; are all chlorinated solvents and strong indicators and/or precursors of 1,4-Dioxane.

171.    EPA did not begin formally testing for 1,4-Dioxane until UCMR-3[22], starting in 2013, almost twenty (20) years after EPA completed its cleanup, and therefore EPA did not include 1,4-Dioxane or PFAS as part of its investigation or remedial cleanup at this site.

172.    NYSDEC began requiring testing for 1,4-Dioxane and PFAS at cleanup sites in January 2020, and therefore NYSDEC also did not include 1,4-Dioxane or PFAS as part of this cleanup.

173.    EPA removed the Pasley Solvents & Chemicals site from the superfund list in September 2011, before EPA required testing for 1,4-Dioxane in drinking water and almost ten (10) years before NYSDEC required testing for it and PFAS at cleanup sites.

174.    There is no record that the EPA's remedial program addressed either 1,4-Dioxane or PFAS contamination at this site, let alone even tested for it.

175.    Based on the foregoing, both PFAS and 1,4-Dioxane have been released at the Pasley Site.  TCA was found in groundwater at the site at high concentration.  The majority of TCA during Pasley's operations at the site has been stabilized with 1,4-Dioxane.  Likewise, multiple studies show that PFAS were used in the degreasing operations.

176.    The Pasley Solvents and Chemicals Site is also within the eastern portion of the Old Roosevelt Field Superfund Site, specifically within Operable Unit 2 ("OU2").  EPA conducted a remedial investigation of OU2 from 2014 to 2016 to determine the extent of groundwater contamination.

177.    As part of the remedial design for the OU2 remedial action, EPA has proposed installing groundwater extraction wells to address the volatile organic compound (VOC)

---

[22] The Third Unregulated Contaminant Monitoring Rule – the Safe Drinking Water Act requires EPA to issue a list of unregulated contaminants to be monitored by public water systems.  The UCMR is updated every five (5) years. *See,* https://www.epa.gov/dwucmr/third-unregulated-contaminant-monitoring-rule

contamination. The wells are proposed to be located along Garden Street, near the intersection of Boylston Street, in Garden City, NY. This is just south and hydrologically downgradient of the Pasley Solvents and Chemicals Site. This treatment is not designed to address PFAS or 1,4-Dioxane contamination.

178.    At the request of the NYSDEC, in 2023 EPA tested OU2 for PFAS and 1,4-Dioxane. In May 2023 EPA collected groundwater samples at the Old Roosevelt Field Superfund Site and reported PFOS concentrations of 11.3 ng/L[23] and PFOA concentrations of 13.0 ng/L, using EPA Method 1633 for analysis. In this same analysis, several other types of PFAS were identified, including PFBA (3.98 ng/L), PFHpA (4.80 ng/L), PHFxA (5.61 ng/L), PFHxS (3.59 ng/L), and PFNA (2.67 ng/L).

179.    The Village's water supply wells are downgradient of both the Pasley Solvents and Chemicals Site and EPA's proposed extraction wells.

180.    The Pasley Solvents and Chemicals Site is located within the capture zone for Plaintiff's Water Source and 1,4-Dioxane and PFAS released from it have migrated to Plaintiff's Water Source.

181.    Defendant **Commander Oil Corporation** ("Commander") is a New York business corporation with its principal place of business in New York.

182.    Commander owned and operated at 565 Commercial Avenue, Garden City, New York prior to leasing the property to Pasley Solvents and Chemicals, Inc. in or around 1969. Upon information and belief, Commander sold the site in or around 2003.

---

[23] 1.0 ng/L, or 1.0 nanograms per liter, is the equivalent of 1 nanogram of a substance in 1 liter of liquid. In water, 1 ng/L is the equivalent of 1ppt (part per trillion) because 1 liter of water weighs about 1 kilogram.

183.    Prior to leasing the site to Pasley Solvent & Chemical, Inc., Commander operated the site as a facility for bulk storage of fuel oil and distribution.  Commander had configured the site as a tank farm, with at least a dozen above ground tanks, loading platforms, and related equipment.

184.    Upon information and belief, Commander and its tenant Pasley Solvents used and/or stored products containing PFAS and TCA or 1,4-Dioxane.

185.    The Pasley Solvents and Chemicals Site is located within the capture zone for Plaintiff's Water Source.

186.    As a direct and proximate result of Commander's actions, conduct, and omissions in the operation of this facility, PFAS and 1,4-Dioxane released from it migrated to Plaintiff's Water Source.

187.    As the owner of the Pasley Solvents and Chemicals Site during the time of a release of hazardous substances, Commander is liable for response costs under CERCLA.

188.    Defendant **Fortune Avenue Holdings LLC** ("Fortune Avenue") is a New York limited liability company with a principal place of business in New York.

189.    Fortune Avenue is the current owner of the Pasley Solvents and Chemicals Site, located at 565 Commercial Avenue, Garden City, NY 11530 ("Fortune Avenue Facility").

190.    The hazardous and toxic substances released at the above property contained 1,4-Dioxane.   They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

191.    Fortune Avenue is liable for the actions, omissions and operations at the 565 Commercial Avenue which have and continue to contaminate Plaintiff's wells with 1,4-Dioxane.

192.    The hazardous and toxic substances released at the above property contained PFAS. They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

193.    Fortune Avenue is liable for the actions, omissions and operations at the 565 Commercial Avenue Site which have and continue to contaminate Plaintiff's wells with PFAS.

### D.    61-65 COMMERCIAL AVENUE, GARDEN CITY, NEW YORK

194.    Defendant **Chery Industry Equipment (New York) Inc.** ("Chery Industry") is a New York corporation with a principal place of business in New York.

195.    At all times relevant herein, Chery Industry operates or operated a facility at 61-65 Commercial Ave, Garden City, New York (the "Chery Industry Facility").

196.    The Chery Industry Facility has a known history of PFAS, 1-4-dioxane, and other types of groundwater contamination due to its location within the Old Roosevelt Field Superfund Site.

197.    The Chery Industry Facility is within the eastern portion of the Old Roosevelt Field Superfund Site, specifically within Operable Unit 2 ("OU2").

198.    At the request of NYSDEC, EPA tested OU2 for PFAS and 1,4-Dioxane.  In May 2023 EPA collected groundwater samples at the Old Roosevelt Field Superfund Site and reported PFOS concentrations of 11.3 ng/L and PFOA concentrations of 13.0 ng/L, using EPA Method 1633 for analysis.  In this same analysis, several other types of PFAS were identified, including PFBA (3.98 ng/L), PFHpA (4.80 ng/L), PHFxA (5.61 ng/L), PFHxS (3.59 ng/L), and PFNA (2.67 ng/L).

199.    As part of the remedial design for the OU2 remedial action, EPA has proposed installing groundwater extraction wells to address the volatile organic compound (VOC)

contamination.  The wells are proposed to be located along Garden Street, near the intersection of Boylston Street, in Garden City, NY.  This is just south and hydrologically downgradient of the Chery Industry Facility. This treatment is not designed to address PFAS or 1,4-Dioxane contamination.

200.    The Village's water supply wells are downgradient of both the Chery Industry Facility and EPA's proposed extraction wells.

201.    Cherry Industry manufactures and sells a range of industrial and construction products.  These include industrial storage, shipping containers, construction and agricultural equipment, and metal farm and garden products.  PFAS have been used as lubricants and hydraulic fluids in industrial applications like those at the Cherry Industry Facility, in powder-coated metal products like those sold at the Cherry Industry Facility, and as waterproofing in products sold at the Cherry Industry Facility.

202.    The Cherry Industry Facility is located within the capture zone for Plaintiff's Water Source and as a direct and proximate result of Chery Industry's actions, conduct, and omissions in the operation of this facility, PFAS released from it migrated to Plaintiff's Water Source.

203.    Defendant **Irace Realty LLC** ("Irace Realty") is a New York limited liability company with its principal place of business in New York.

204.    Irace Realty is the current owner of the Cherry Industry Facility at 61-65 Commercial Avenue, Garden City, New York.

205.    The hazardous and toxic substances released at the above property contained 1,4-Dioxane.  They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

206.    Irace Realty is liable for the actions, omissions and operations at the Cherry Industry Facility which have and continue to contaminate Plaintiff's wells with 1,4-Dioxane.

207.    The hazardous and toxic substances released at the above property contained PFAS. They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

208.    Fortune Avenue is liable for the actions, omissions and operations at the Cherry Industry Facility which have and continue to contaminate Plaintiff's wells with PFAS.

## E.    122-122 SECOND STREET, MINEOLA, NEW YORK

209.    Defendant **Nassau Chromium Plating Co., Inc.** ("Nassau Chromium") is a New York Corporation with its principal place of business in New York.

210.    Nassau Chromium is a metal finishing company specializing in electroplating and anodizing.  Nassau Chromium has been operating the facility at 122 Second Street, Mineola, NY since 1929 (the "Nassau Chromium Facility").[24]

211.    The Nassau Chromium Facility has approximately 50 plating tanks and services the defense and aerospace industries, among others.  Chromium processing carries inherent risks of spills.

212.    EPA has determined that chromium plating operations are the predominant source of PFAS discharges, particularly PFOS, by the metal finishing and electroplating source category. PFOS were used commonly within chromium plating operations due to their historical role as fume suppressants to mitigate hexavalent chromium emissions during the plating process.  EPA amended the Chromium NESHAP such that "[a]fter September 21, 2015, the owner or operator of

---

[24] The Nassau Chromium Facility is also identified as 112-122 2nd Street, Mineola, NY.

an affected open surface hard chromium electroplating tank shall not add PFOS-based fume suppressants to any affected open surface hard chromium electroplating tank",[25] like those used at the Nassau Chromium Facility.  The Surface Technology Environmental Resource Center, a compliance assistance center for the surface finishing industry, notes that replacements for PFOS still contain a type of PFAS, such as fluorotelomer sulfonic acid (6:2 FTSA).[26]

213.    Fumetrol 140 was a common PFOS surfactant used in chromium plating.

214.    In various metal finishing processes, PFAS served functions such as wetting agents, fume suppressants, and surfactants in processes like electroplating, electroless plating, anodizing, and powder coating.  For instance, PFAS compounds like PFOS have been used to enhance deposition quality and reduce surface tension in plating baths.[27]

215.    PFAS from the Nassau Chromium Facility were released via wastewater effluent, surface runoff, and other aspects of their operations, including ordinary use and handling of the chemicals.

216.    Nassau Chromium has a history of non-compliance with environmental laws.  In June 2009 EPA, through the U.S. Department of Justice, filed a federal complaint against Nassau Chromium for violations of the National Emission Standards for Chromium Emissions from Hard and Decorative Chromium Electroplating and Chromium Anodizing Tanks ("Chromium

---

[25] *See* 40 C.F.R. § 63.342 (c)(1)(v) (National Emission Standards Hazardous Air Pollutants for Chromium Emissions from Hard and Decorative Chromium Electroplating and Chromium Anodizing Tanks) ("Chromium Electroplating NESHAP").

[26] *See* https://www.sterc.org/pfas_resources.php

[27] *See* https://www.pca.state.mn.us/sites/default/files/gp3-05.pdf

Regulations").[28]   EPA alleged Nassau Chromium failed to minimize its release of hexavalent chromium, "among the most toxic of air pollutants listed under the [Clean Air Act]."[29]

217.    Chlorinated solvents such as TCA have been used for degreasing, for preparation of materials for chrome plating and for equipment repair and maintenance.  Stabilizers like 1,4-Dioxane are required to inhibit reactions between solvents and metals to prevent forming of acids as solvent decomposes.[30]

218.    The Nassau Chromium Facility is located within the capture zone for Plaintiff's Water Source and as a direct and proximate result of Nassau Chromium's actions, conduct, and omissions in the operation of this facility, PFAS and 1,4-Dioxane released from it migrated to Plaintiff's Water Source.

219.    Defendant **Kendave Corporation** ("Kendave") is a New York corporation with its principal place of business in New York.

220.    Kendave is the current owner of 112 Second Street, Minloa, NY.

221.    The hazardous and toxic substances released at the above property contained 1,4-Dioxane.  They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

222.    Kendave is liable for the actions, omissions and operations at the Nassau Chromium Facility which have and continue to contaminate Plaintiff's wells with 1,4-Dioxane.

223.    The hazardous and toxic substances released at the above property contained PFAS. PFAS infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

---

[28] https://www.justice.gov/archive/usao/nye/pr/2009/2009jun25.html

[29] *Id.*

[30] *See* https://14d-1.itrcweb.org/history-of-use-and-potential-sources

224.    Kendave is liable for the actions, omissions and operations at the Nassau Chromium Facility which have and continue to contaminate Plaintiff's wells with PFAS.

## F.    625 SOUTH STREET, GARDEN CITY, NEW YORK

225.    Defendant **Rococo Associates, Inc.** ("Rococo") is a New York corporation with its principal place of business in New York.

226.    Rococo is the owner of a facility located at 625 South Street, Garden City, New York (the "Rococo Facility"), which it purchased in approximately 2011.

227.    The Rococo Facility was previously owned and operated by Award Packaging Corp. and was registered as a New York State superfund site – DEC Site No. 130155.

228.    From approximately 1967 to 2007 the Rococo Facility was used for application of print to plastic packaging material. During this time wastes were disposed of in two drywells and one interior floor drain. In 2004, contaminated materials were partially excavated from the drywells and floor drain. NYSDEC detected groundwater contamination at the bottom of the excavated drywells. NYSDEC and Rococo entered into an order on consent on July 30, 2007, in which Rococo agreed to implement a remedial program.

229.    Recent monitoring at the Rococo Facility found levels of TCA at 161.0 ppb in the soil vapor near the former raw material storage area for Award Packaging.[31]

230.    The Rococo Facility is located within the capture zone for Plaintiff's Water Source and 1,4-Dioxane and TCA released from it migrated to Plaintiff's Water Source.

---

[31] *See* FPM Group, *Soil Vapor Intrusion Sampling Data Submittal – Award Packaging Corp.* (June 14, 2023).

231.    The hazardous and toxic substances released at the above property contained 1,4-Dioxane.  They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

232.    Rococo is liable for the actions, omissions and operations at the Rococo Facility which have and continue to contaminate Plaintiff's wells with 1,4-Dioxane.

233.    The hazardous and toxic substances released at the above property contained PFAS. They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

234.    Rococo is liable for the actions, omissions and operations at the Rococo Facility site which have and continue to contaminate Plaintiff's wells with PFAS.


G.    **425 MERRICK AVENUE, WESTBURY, NEW YORK**

235.    Prior to 1990, New York University (NYU) operated a research and educational facility at 425 Merrick Avenue, Westbury, NY.  The site was primarily used for scientific research, teaching laboratories, and small-scale pilot projects.

236.    The facility generated laboratory chemical waste, including solvents, acids, bases, and organic reagents, consistent with university research practices.  Solvents were used widely in academic laboratories.

237.    The past research and development activities at the site resulted in the disposal of PCBs, metals and PAHs at the site.  After NYU vacated the property in 1990, 200-300 drums and containers with chemicals were discovered at various locations throughout the property.  These drums contained residual waste, liquids, and demolition-related debris.

238.     According to NYSDEC, waste from the operation of the site may have included PCBs from the transformers, capacitors, and machine oils used in compressors, mercury from lab instruments, and cuttings and filings from fabrication of tools.

239.     An interim remedial measure ("IRM") was conducted between 1997 and 2001 that included demolishing all structures on the site, removal of contaminated soil, and disposing of over 1,100 pounds of potentially hazardous materials.

240.     Environmental cleanup at the site was completed well before EPA required testing for 1,4-Dioxane in drinking water and almost twenty (20) years before NYSDEC required testing for it and PFAS at cleanup sites.

241.     The site at 425 Merrick Avenue, Westbury, NY is located within the capture zone for Plaintiff's Water Source and 1,4-Dioxane and TCA released from it migrated to Plaintiff's Water Source.

242.     Defendant **New York University** ("NYU") is a New York not-for-profit corporation with its principal place of business in New York.

243.     NYU operated at 425 Merrick Avenue, Westbury, NY from approximately 1970 until 1990.  Environmental assessments and regulatory filings indicate that the facility supported a range of laboratory operations typical of university research centers during that era.

244.     NYU left the site with hundreds of drums of waste on it, including liquid waste. During NYU's operation, both PFAS and solvents containing 1,4-Dioxane leaked from the site.

245.     The 425 Merrick Avenue facility is located within the capture zone for Plaintiff's Water Source and as a direct and proximate result of NYU's actions, conduct, and omissions in the operation of this facility, PFAS and 1,4-Dioxane released from it migrated to Plaintiff's Water Source.

246.    Defendant **Meadowbrook Management & Realty Corp.** ("Meadowbrook") is a New York corporation with its principal place of business in New York.

247.    Meadowbrook is the current owner of the facility located at 425 Merrick Avenue, Westbury, NY.

248.    The hazardous and toxic substances released at the above property contained 1,4-Dioxane.    They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

249.    Meadowbrook is liable for the actions, omissions and operations at the 425 Merrick Avenue site which have and continue to contaminate Plaintiff's wells with PFAS and 1,4-Dioxane.

250.    The hazardous and toxic substances released at the above property contained PFAS. They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

251.    Meadowbrook is liable for the actions, omissions and operations at the 425 Merrick Avenue site which have and continue to contaminate Plaintiff's wells with PFAS.

## H.    48 SEWELL STREET, HEMPSTEAD, NEW YORK

252.    The site located at 48 Sewel Street, Hempstead, New York was occupied by a bus garage (Sempke Bus) from approximately 1945 through 1972.  More importantly, it was occupied by Husslein Plating Corporation ("Husslein Plating"), an electroplating company that operated at the site from 1972 through 1995.

253.    A fire in 1995 resulted in the release of 400 gallons of nickel-plating solution and chromium solutions at this site, and another fire in 1999 resulted in extensive damage to the building on site, leading to demolition of the building.

254.    NYSDEC recorded at least two known spills at this facility, a 1995 spill of "unknown petroleum" and a 2004 spill of xylene.

255.    PFAS, particularly PFOS, were used commonly in electroplating to reduce surface tension and suppress aerosols above the tank and used as universal wetting agents.  Husslein Plating stored and handled plating chemicals, including PFOS, at the site and used above-ground vats for the electroplating.

256.    Chlorinated solvents have been used for degreasing, for preparation of materials for chrome plating and for equipment repair and maintenance.  Stabilizers such as 1,4-Dioxane are required to inhibit reactions between solvents and metals to prevent forming of acids as solvent decomposes.[32]

257.    The facility went through a remediation supervised by the NYSDEC, which identified nickel and chromium in soil and groundwater as the contaminants of concern. Remediation was complete in 2014.

258.    NYSDEC did not begin requiring testing for 1,4-Dioxane and PFAS at cleanup sites until January 2020, and therefore NYSDEC did not consider 1,4-Dioxane or PFAS at current regulatory levels as part of its cleanup.

259.    Defendant **Fildon LLC** ("Fildon") is a New York limited liability with its principal place of business in New York.

260.    Fildon is the current owner of the Former Husslein Plating Corp. & Sempke Bus Garage site at 48 Sewell Street, Village of Hempstead, NY (the "Fildon Facility").

---

[32] *See* https://14d-1.itrcweb.org/history-of-use-and-potential-sources.

261.    The hazardous and toxic substances released at the above property contained 1,4-Dioxane.  They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

262.    Fildon is liable for the actions, omissions and operations at the 48 Sewell Street Site which have and continue to contaminate Plaintiff's wells with 1,4-Dioxane.

263.    The hazardous and toxic substances released at the above property contained PFAS. They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

264.    Fildon is liable for the actions, omissions and operations at the 48 Swell Street Site which have and continue to contaminate Plaintiff's wells with PFAS.

<u>**FIRST CAUSE OF ACTION**</u>
**Cost Recovery Liability Pursuant to 42 U.S.C. § 9607 (CERCLA)**

265.    Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

266.    Under CERCLA, 42 U.S.C. §§ 9601, *et seq*., owners and operators of facilities are liable for "costs of response incurred by any…person" occasioned by a "release, or a threatened release which causes the incurrence of response costs, of a hazardous substance," and other forms of compensation.  42 U.S.C. § 9607(a).

267.    Plaintiff is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

268.    Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

269.    Each Defendant is, or was, an "owner" and/or "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

270.    Each of Defendants' locations identified above is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

271.    CERCLA defines the term "release" broadly and it means, among other things, "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment…."  42 U.S.C. § 9601(22).

272.    PFOA and PFOS are each a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

273.    1,4-Dioxane is a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

274.    There have been "releases", and/or continue to be releases, and/or disposal of PFOA, PFOS, and 1,4-Dioxane from each Defendant's facility within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).  Upon information and belief, these releases or threatened releases are ongoing.

275.    The hazardous substances released from Defendants' facilities were, and are being, released within the source water protection area for Plaintiff's Water Source and migrated to Plaintiff's Water Source.

276.    Plaintiff has incurred and will continue to incur necessary response costs pursuant to CERCLA § 107(a), all of which are, and will be, consistent with the national contingency plan, as a result of the release and/or threatened releases of hazardous substances from Defendants' facilities.

277.    Each Defendant is therefore a responsible party pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and liable for necessary response costs as the owner or operator

of a facility from which there was a release of hazardous substances that have contaminated Plaintiff's public drinking water supply.

278.    By reason of the foregoing, Defendants are liable, jointly and severally, for Plaintiff's necessary response costs, and damages regarding contamination to Plaintiff's public water supply from PFOA, PFOS, and 1,4-Dioxane.

## SECOND CAUSE OF ACTION
### Declaratory Judgment Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2) (CERCLA)

279.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

280.    CERCLA § 113(g)(2) provides in pertinent part: "In any action described in this subsection [, which includes 42 U.S.C. §§ 9607(a),] the court shall enter a declaratory judgment of liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 113 (g)(2).

281.    By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Plaintiff is entitled to a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances in Plaintiff's public drinking water supply as referenced herein.

282.    A declaratory judgment will prevent the need for multiple lawsuits as Plaintiff continues to incur costs for which Defendants are liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

283.    A declaratory judgment will establish Defendants' allocation of costs associated with addressing the contamination of the public water supply, insuring an equitable and efficient response to the problem.

284.     Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the contamination of Plaintiff's public drinking water supply.

285.     Plaintiff will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its drinking water supply with hazardous substances.

286.     Plaintiff's costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

287.     Plaintiff is thus entitled to a declaratory judgment regarding Defendants' liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

### THIRD CAUSE OF ACTION
### Continuing Public Nuisance

288.     Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

289.     Plaintiff, its residents, and businesses have the common law right to clean, safe, potable source of water of their own choosing.

290.     The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

291.     Plaintiff supplied a clean, safe, portable source of water until it was discovered that PFAS and 1,4-Dioxane contamination had migrated to Plaintiff's water supply.

292.     Defendants by their negligent, reckless, and willful acts have caused the release of PFAS and 1,4-Dioxane from their facilities that, because their facilities are either within the

Plaintiff' delineated Wellhead Protection Area or Watershed Zone of Critical Concern, have migrated into Plaintiff' Water Sources.

293.    Defendants released PFAS and 1,4-Dioxane through direct discharge, water emissions, air deposition, spills, runoff, during defendants' respective manufacturing or operations, and as part of industrial wastewater and solid waste.

294.    By their actions, Defendants have unreasonably and substantially interfered with and/or endangered (i) the public right to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater; (ii) Plaintiff's special status and authority regarding its natural resources; (iii) Plaintiff' ability to protect, conserve, and manage its natural resources; and (iv) the rights of the people of its citizens to enjoy their natural resources from interference by pollution and contamination.

295.    Defendants' conduct has injured the property, health, safety and/or comfort of a considerable number of persons.

296.    The public nuisance caused by the presence of PFAS and 1,4-Dioxane in Plaintiff' drinking water supply, both existing concentrations and those still migrating to it, has affected the public at large and has had, and will continue to have, a significant impact.

297.    The acts and omissions of Defendants unreasonably and significantly interfered with, and continue today to unreasonably and significantly interfere with, the common rights of Plaintiff, its residents, and business, to a safe source of drinking water of their own choosing, and have caused and continue today to cause, detrimental effects on the public health, welfare, safety, comfort, and convenience of the residents and businesses, thus creating a public nuisance.

298.    Defendants knew or, in the exercise of reasonable care should have known, that the release of PFAS and 1,4-Dioxane into natural resources and Plaintiff's Water Sources would and

has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment of vital groundwater resources relied upon by Plaintiff and the public.

299.    As a direct and proximate result of Defendants' conduct, they have created an ongoing public nuisance, and Plaintiff has incurred substantial damages, and will incur additional damages to remove PFAS and 1,4-Dioxane from the public water supply so Plaintiff can provide its residents and consumer with clean and healthy water.

300.    The interference with Plaintiff's ability to deliver uncontaminated drinking water far outweighs any social utility of Defendants' actions.

301.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## FOURTH CAUSE OF ACTION
### Continuing Trespass

302.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

303.    Plaintiff is the owner, operator, and actual possessor of real property and improvements used for collecting drinking water from Plaintiff' Water Sources and delivering drinking water to their residents and users of it.

304.    Defendants intentionally engaged in the actions that caused the release of PFAS and 1,4-Dioxane from their facilities.

305.    Upon information and belief, Defendants knew, or should have known, that PFAS and 1,4-Dioxane contamination migrated through groundwater and surface water contaminating Plaintiff' real property used for collecting, treating, and delivering drinking water and the drinking water itself.

306.    Defendants did not and do not have authority, privilege, or permission to trespass upon Plaintiff' property interests.

307.    The acts and omissions of Defendants caused the PFAS and 1,4-Dioxane contamination to migrate, via surface soils and sediments, stormwater runoff, the ground, the Ohio river and its tributaries, and groundwater, contaminating Plaintiff' real property used for collecting, treating, and distributing drinking water, interfering with its property rights, including Plaintiff' right to the full use and enjoyment of its water system for treatment and distribution to residents and businesses. These acts and omissions created a trespass on Plaintiff' property and unlawful interference with Plaintiff' property rights.

308.    As a direct and proximate cause of Defendants' conduct in creating an ongoing trespass against Plaintiff' property, in the form of the ongoing PFAS and 1,4-Dioxane contamination of Plaintiff' water system, Plaintiff have incurred substantial damages and will incur additional damages to remove PFAS and 1,4-Dioxane from the public water supply in order to provide their residents and customers with clean and healthy water.

309.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined at the time of trial.

## FIFTH CAUSE OF ACTION
### Negligence

310.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

311.    Defendants knew or should have known that PFAS, PFAS containing products and materials, 1,4-Dioxane, and other toxic chemicals, create a substantial risk of harm to surface water and groundwater and to members of the public who consume such surface water and groundwater.

312.    Defendants knew or should have known that the chemicals containing PFAS, 1,4-

Dioxane, and other toxic substances which they were distributing, purchasing, transporting, using, processing, mixing, storing, handling and/or disposing create a substantial risk of harm contaminating the soil, surface waters, groundwater, the aquifers and therefore, Plaintiff's Water Source.

313. Defendants negligently distributed, stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise permitted the release of PFAS at and from their facilities and/or properties as to cause severe contamination of surface waters, soil, groundwater, and/or the aquifer, and/or said Defendants own or owned the properties upon which such actions and/or results occurred.

314. Defendants owed Plaintiff a duty to act as reasonable operators and/or owners of property and to take all necessary precautions to prevent the release of PFAS, 1,4-Dioxane, and other toxic chemicals into the surface waters, soil and groundwater at their properties.

315. Defendants owed Plaintiff a cognizable duty to exercise reasonable care in the purchasing, transporting, using, processing, mixing, storing, handling and/or disposing of PFAS and 1,4-Dioxane and/or in owning property upon which such actions and/or results occurred to take reasonable measures to prevent the release and spread of PFAS, 1,4-Dioxane, and other toxic chemicals into the hydrological features and into Plaintiff' Water Source.

316. Defendants owed Plaintiff a duty to act as reasonable operators and/or owners of property and to take all necessary steps to prevent the continuing and future release of PFAS and 1,4-Dioxane from their facilities and/or properties.

317. Upon learning of a release of solvents and compounds, including but not limited to PFAS containing products, PFAS, 1,4-Dioxane, and other toxic chemicals, at their facilities and/or properties, Defendants owed Plaintiff a duty to act reasonably to remediate, contain, and

eliminate the release before it contaminated Plaintiff's Water Source.

318.    Defendants breached the above duties and failed to prevent the releases of PFAS containing products at their properties.

319.    Defendants also failed to take reasonable, adequate, and sufficient actions to eliminate, correct, or remedy the releases of PFAS, 1,4-Dioxane, and other toxic chemicals after they occurred.

320.    Defendants continue to breach their duties to remediate and prevent ongoing and future releases of PFAS, 1,4-Dioxane, and other toxic chemicals from their properties into Plaintiff's Water Source.

321.    As a result of Defendants' breaches of their duties, Plaintiff has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' contamination for many years into the future.

322.    Defendants' breach of their duties was the direct, sole and proximate cause of Plaintiff's damages.

323.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## SIXTH CAUSE OF ACTION:
### Failure To Warn

324.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

325.    Defendants breached their duty to notify and warn Plaintiff of the likelihood of release of hazardous substances, including but not limited to PFAS, 1,4-Dioxane, and other toxic chemicals, at and in the vicinity of Defendants' facilities, and, consequently, in the capture zone of Plaintiff's Water Source.

326.     Upon learning of the release of hazardous substances, including but not limited to PFAS and/or products containing PFAS, 1,4-Dioxane, and other toxic chemicals at their facilities and/or properties, Defendants owed Plaintiff a duty to timely notify and warn Plaintiff of the releases.

327.     Defendants breached that duty by failing to timely notify and warn Plaintiff of the releases of hazardous substances, including but not limited to PFAS, 1,4-Dioxane, and other toxic chemicals, on and under their properties and, consequently, into Plaintiff's Water Source.

328.     As a result of Defendants' breaches of their duty to warn Plaintiff, Plaintiff was forestalled from undertaking effective and immediate remedial measures, and Plaintiff has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

329.     As a direct and proximate result of Defendants' above-described failure to provide warnings, Plaintiff has incurred and will continue to incur the following damages:

   a.  Existing contamination of Plaintiff's water supply, which may have been prevented or mitigated if timely warnings were given;

   b.  Costs of additional testing and monitoring of the hydrological features and Plaintiff's drinking water well for hazardous substances, including but not limited to PFAS, 1,4-Dioxane, and other toxic chemicals' contamination;

   c.  Costs of investigations, risk assessment and planning mitigation measures to address the contamination by hazardous substances, including but not limited to PFAS, 1,4-Dioxane, and other toxic chemicals;

   d.  Costs of treatment for hazardous substances, including but not limited to PFAS, 1,4-Dioxane, and other toxic chemicals, including design, installation and operation of remediation systems to remove PFAS and 1,4-Dioxane to a safe level of non-detect;

   e.  Loss of water production capacity;

   f.  Diminished consumer confidence in Plaintiff's drinking water;

   g.  Potential cost to design and install replacement water sources;

    h.   Attorney fees and costs; and

    i.   Other compensatory damages.

330.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, based on the forgoing claims, Plaintiff request that the Court grants the following relief:

1. Find the Defendants liable, jointly and severally, for necessary response costs as the owners or operators of a facility from which there has been and is a release of hazardous substances including 1,4-Dioxane, PFOA, and PFOS that have contaminated Plaintiff's public drinking water supply, and order Defendants to reimburse the Plaintiff for its past, present, and future costs to investigate, monitor, evaluate, and remediate the 1,4-Dioxane, PFOA, and PFOS that continues to migrate into Plaintiff' public water supply, including the costs of employing outside consultants and testing labs for these tasks.

2. Issue a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances, 1,4-Dioxane, PFOA, and PFOS, contamination in the Village of Hempstead's public drinking water supply.

3. Award Plaintiff monetary damages for the continuing trespass, continuing public nuisance, negligence, and failure to warn caused by the PFAS and 1,4-Dioxane contamination of the Plaintiff's public water supply.

4.    Order Defendants to pay for or agree to reimburse the cost of a treatment system(s) to be installed by Plaintiff to remove PFAS and 1,4-Dioxane from the public water supply.

5.    Award Plaintiff its reasonable attorney fees and legal expenses incurred in evaluating the PFAS and 1,4-Dioxane contamination and prosecuting these claims.

6.    Award Plaintiff such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims for which a jury trial is available.

Dated:  August 15, 2025          Respectfully Submitted,
        New York, New York

                                 */s/ James L. Simpson*
                                 James L. Simpson, Esq.
                                 **NAPOLI SHKOLNIK PLLC**
                                 360 Lexington Avenue, Floor 11
                                 New York, NY  10017
                                 Tel. (212) 397-1000
                                 JSimpson@napolilaw.com

                                 Robert Gitelman, Esq.
                                 **NAPOLI SHKOLNIK PLLC**
                                 400 Broadhollow Road, Suite 305
                                 Melville, NY  11747
                                 Tel. (212) 397-1000
                                 RGitelman@napolilaw.com

                                 Paul J. Napoli, Esq.
                                 **NS PR LAW SERVICES LLC**
                                 1302 Avenida Ponce de León
                                 San Juan, PR  00907
                                 Tel. (833) 271-4502
                                 PNapoli@nsprlaw.com

                                 *Counsel for Plaintiff*